**11-90-cv**
**Velez v. Sanchez**

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2011

(Argued: March 19, 2012                    Decided: July 31, 2012)

Docket No. 11-90-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

LINDA VELEZ,

        *Plaintiff-Counter-Defendant-Appellant*,

           v.

BETSY SANCHEZ,

        *Defendant-Counter-Claimant-*
        *Third-Party-Plaintiff-Appellee*,

SHARI MUNOZ, YOLANDA MUNOZ,

        *Defendants-Counter-Claimants-Appellees*,

           v.

HERNANDO SANCHEZ,

        *Third-Party-Defendant*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: RAGGI and DRONEY, *Circuit Judges*, and MATSUMOTO, *District Judge*.[*]

---

[*] The Honorable Kiyo A. Matsumoto of the United States District Court for the Eastern District of New York, sitting by designation.

Appeal from two orders of the United States District Court for the Eastern District of New York (Block, *J.*) dismissing claims under the Alien Tort Statute, granting summary judgment to Appellees as to the claim under the Fair Labor Standards Act, and dismissing the breach of contract claim. We hold that Appellant fails to show a violation of the law of nations, and therefore affirm the dismissal of the Alien Tort Statute claims. We hold that there are genuine issues of fact remaining as to whether Appellant was a domestic service employee under the Fair Labor Standards Act. We also hold that her breach of contract claim is barred by the Statute of Frauds. Accordingly, the judgment of the district court is AFFIRMED in part and VACATED and REMANDED in part.

ANDREW S. AMER, Simpson Thacher & Bartlett LLP, New York, NY, *for* Plaintiff-Appellant.

SHELDON KARASIK, Simon, Eisenberg & Baum, LLP, New York, NY, *for* Defendants-Appellees.

Suzanne B. Goldberg, New York, NY, *for the Sexuality & Gender Law Clinic of Columbia Law School as* amicus curiae *in support of Plaintiff-Appellant*.

DRONEY, *Circuit Judge*:

This is an appeal from the district court's grant of summary judgment against the plaintiff and its prior grant of a motion to dismiss one count of the amended complaint. Plaintiff-Appellant Linda Velez ("Velez") brought this action against Betsy Sanchez ("Sanchez"), Sanchez's sister Shari Munoz, and Sanchez's and Shari's mother Yolanda Munoz under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-19, and New York state law.

For the reasons that follow, we affirm in part and vacate and remand in part.

**BACKGROUND**

**I.     Procedural Background and Standards of Review**

Velez filed this action on November 5, 2004.  In January of 2006, the defendants moved to dismiss her amended complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)").  The district court dismissed certain claims, including Velez's breach of contract claim, and converted the motion to dismiss as to the remaining claims into a motion for summary judgment.  The court then allowed the parties to complete discovery and submit additional materials.  After discovery, the court found *sua sponte* that it lacked subject matter jurisdiction over Velez's ATS claims and converted them to a claim for a civil remedy under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595, but granted summary judgment to the defendants on all federal claims.  *Velez v. Sanchez*, 754 F. Supp. 2d 488, 495-500 (E.D.N.Y. 2010).  The district court also declined to exercise subject matter jurisdiction over the remaining state law claims and counterclaims. *Id.* at 500.

This posture requires us to apply different standards of review to Velez's appealed claims.  We review the dismissal of her breach of contract claim *de novo*, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011) (citation omitted).

We also review the district court's summary judgment decision on her claims under the TVPRA and FLSA *de novo* and apply "the same standards that govern the district court's consideration of the motion."  *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010).

A grant of summary judgment should be affirmed "only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Id.* at 545 (citing Fed. R. Civ. P. 56(c)(2)). In making its determinations, the court deciding summary judgment should "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Finally, we review "questions of subject matter jurisdiction *de novo*." *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010), *cert. granted*, 132 S. Ct. 472 (2011). We are entitled at any time during the proceeding to "*sua sponte* . . . delve into the issue of whether there is a factual basis to support" the exercise of subject matter jurisdiction, and we are not limited in "our right to refer to any material in the record." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 108 (2d Cir. 1997).

Keeping these standards in mind, we describe the relevant facts below, taking them in part from Velez's complaint and in part from the deposition testimony and other evidence provided at summary judgment.

**II.     Factual Background**

Velez is a citizen of Ecuador and lived there with her mother and Luis Munoz, who is also Sanchez's biological father. Sanchez lived in New York with Shari Munoz and their mother Yolanda Munoz. In 2001, Sanchez asked her father, Luis Munoz, to find a girl who would be willing to move to the United States to help take care of Sanchez's daughter. After some discussions, Velez, who was then 16 years old, agreed to leave Ecuador and move in with Sanchez in New York. Velez was to provide babysitting, and in return, Sanchez promised to

4

provide Velez with room and board and an $80 weekly wage, to enroll her in high school, and to assist her with enrolling in and paying for college. With Sanchez's help, Velez obtained a tourist visa and flew to New York on September 20, 2001. Shortly after her arrival in New York, Sanchez took Velez's passport and put it in an unlocked drawer for safekeeping.

During her time at the Sanchez house, Velez provided childcare as well as household services such as laundry, cleaning, and vacuuming. Her services were substantial; she stated at her deposition that for months she worked eleven to twelve hours a day, seven days a week, all without the promised pay. Her childcare responsibilities also prevented her from attending high school.

Velez admits that Sanchez took steps to integrate her into her family and life in the United States. Velez was allowed to send emails from Sanchez's computer and to use the telephone while staying with Sanchez. She also maintained several friendships and spent unsupervised time with those friends outside of the Sanchez home. Velez also regularly exercised at the local YMCA without supervision through a membership paid for by Sanchez, visited the library by herself, opened a bank account on her own, and temporarily held a part-time job and attended classes as part of a General Educational Development program. Sanchez took Velez to movies and other "performances," and Velez participated in holiday celebrations with the family. Beginning in mid-2002, Velez began attending English classes on Saturdays, and those classes were paid for by Sanchez.

During the course of her stay in the Sanchez household, Velez was not paid the promised weekly salary, even though she repeatedly requested it. According to Velez's deposition testimony, a few months before Velez left the Sanchez household in late 2003, Sanchez signed a

5

document again promising her a salary of $80 per week and that Velez would be free to do as she wished once Sanchez returned from work.[1]

As some of Sanchez's promises continued to remain unfulfilled, however, the relationship between Velez and the Sanchez family began breaking down. Sanchez and Shari Munoz called Velez ungrateful and disobedient and a "whore," told Velez that "they could do anything with [her] because they own [her]," and repeatedly threatened to send her back to Ecuador. Velez Dep. at 554-56. Sanchez also eavesdropped on Velez's telephone conversations with her family in Ecuador. The conflict ultimately led to a confrontation on November 8, 2003, while Velez was visiting a friend. During this confrontation, Shari Munoz grabbed her by the arm and pushed her into a car. Later that day, when Velez then refused to obey Sanchez's instructions, Sanchez grabbed Velez by the arm and told her to stay in a room of her house until given permission to leave.

Velez left the Sanchez home on November 11, 2003. She obtained a T-visa, available to trafficking victims, remains in New York, and has received psychiatric help for depression and post-traumatic stress disorder.

Velez claims that she remained in the Sanchez household for so long in part because she loved Sanchez's children and wanted to help them, but also because she wished to stay in the United States. Velez considered Sanchez a sister, but denies that she considered Sanchez a parent with parental control over her. Sanchez maintains, however, that she considered herself Velez's "proxy parent" and felt responsible for supervising her. Sanchez Aff. in Support of Mot. to Dismiss ¶ 14. Sanchez describes Velez as desperately wanting to stay in the United States and

---

[1] Velez did not keep a copy of this document, and it is not included in the record.

6

"[f]latly and unequivocally" refusing to leave the Sanchez household even when her visa expired. *Id.* ¶ 15. She claims that Velez only left the Sanchez household to pursue a romantic relationship with Sanchez's husband. For the purposes of summary judgment, however, we assume that these factual disputes will be resolved in favor of Velez.

Velez brought this action against Sanchez, Shari Munoz, and Yolanda Munoz, claiming in her amended complaint that she was deceived when asked to come to New York and made to work long hours without compensation. She claimed that Sanchez, with the aid of the other defendants, kept her isolated and psychologically abused her while forcing her to provide domestic services. The three defendants asserted various state-law counterclaims, alleging that Velez refused to leave the United States, stole from Sanchez, and started an affair with Sanchez's husband. Sanchez also brought a third-party complaint against her now ex-husband, Hernando Sanchez, for indemnification and contribution.

**DISCUSSION**

**I.      Jurisdiction Under the ATS**

Velez alleged ATS violations for involuntary servitude, slavery, forced labor, and trafficking. The district court determined that the ATS does not confer jurisdiction over violations of the law of nations committed in the United States, and therefore it *sua sponte* dismissed the ATS claims for lack of jurisdiction. We affirm the district court, but on a different ground: Velez failed to establish a genuine issue of material fact that the defendants violated international law under the ATS. *See Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 49 (2d Cir. 2010) ("We may affirm the district court's decision on any ground appearing in the record."), *cert. denied*, *Freedom Holdings, Inc. v. Schneiderman*, 131 S. Ct. 1810 (2011).

7

The ATS provides that district courts have "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.[2] To decide whether conduct violates the law of nations—referred to as customary international law[3]—a court should first determine whether a rule is "well-established" and "universally recognized" as a "norm[] of international law." *Filartiga v. Pena-Irala*, 630 F.2d 876, 888 (2d Cir. 1980).

The ATS was enacted in 1789 to confer jurisdiction on federal courts over claims by aliens for "the modest number of international law violations with a potential for personal liability at the time." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004). The ATS was largely unused, however, until this Circuit held that the statute provided jurisdiction over an alien's claim of "deliberate torture perpetrated under color of official authority." *Filartiga*, 630 F.2d at 878. In *Filartiga*, Paraguayan citizens living in the United States brought an action under the ATS against a former Paraguayan official—also then living in the United States—for torturing and killing their family member while in Paraguay. *Id.* at 878. After reviewing the relevant sources of international law, we held that the prohibition of torture has become a part of customary international law, and therefore torture by government officials violates the law of

---

[2] Appellate review of ATS litigation has been sparse. *Kiobel*, 621 F.3d at 116-17 & n.8 (finding only nine significant Second Circuit ATS opinions since 1980 and one Supreme Court opinion on the statute and noting that "there remain a number of unresolved issues lurking in our ATS jurisprudence").

[3] We have come to use the term "customary international law" interchangeably with the "law of nations." *See, e.g.*, *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 116 (2d Cir. 2008) ("[T]he law of nations has become synonymous with the term 'customary international law,' which describes the body of rules that nations in the international community universally abide by, or accede to, out of a sense of legal obligation and mutual concern." (internal quotation marks and citation omitted)).

8

nations. *Id.* at 878, 884. However, while the plaintiffs in *Filartiga* urged that the ATS should be treated as a statute not only conferring jurisdiction but also creating causes of action, we construed the ATS "not as granting new rights to aliens, but simply as opening the federal courts for adjudication of the rights already recognized by international law." *Id.* at 887. We also recognized that because ATS jurisdiction depends on a violation of a law of nations, "a more searching preliminary review of the merits" is required than the review conducted for asserting jurisdiction under the "arising under" grant of federal jurisdiction under 28 U.S.C. § 1331. *Id.*

*Filartiga* spawned an expansion in ATS litigation, and courts differed in their conclusions as to whether the ATS merely granted jurisdiction or whether it also created private causes of action for international law violations. The Supreme Court took up this issue in 2004 in its only interpretation of the ATS. In *Sosa v. Alvarez-Machain*, a Mexican national was abducted in Mexico and transported by agents of the United States Drug Enforcement Administration ("DEA") and Mexican officials to California to be prosecuted for the torture and murder of a DEA agent in Mexico. 542 U.S. at 697-98. Following his acquittal in the criminal case, the Mexican national filed an action in the district court for the Central District of California under the ATS against his abductors. The district court awarded damages and the Ninth Circuit affirmed the ATS judgment. The Supreme Court reversed on the basis that the circumstances of the illegal detention did not violate international law. *Id.* at 699.

After considering the legislative history of the ATS, the Supreme Court in *Sosa* rejected the notion that the "ATS was stillborn" in that "there could be no claim for relief without a further statute expressly authorizing adoption of causes of action." *Id.* at 714. It held that the ATS was intended to provide jurisdiction for a narrow set of common law actions derived from the law of nations. *Id.* at 719-20.

While acknowledging no categorical bar on federal courts' recognizing other claims under the law of nations as an element of common law, *see id.* at 725, *Sosa* instructs that the exercise of this discretion must be "subject to vigilant doorkeeping," *id.* at 729; *see id.* at 725 (acknowledging "good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action" under the ATS).[4] Before recognizing an ATS cause of action, a federal court must ensure that the international norm being violated is as definite and as accepted among civilized nations as the "historical paradigms familiar" when the ATS was enacted. *Id.* at 732. The paradigms familiar to the First Congress, which crafted the ATS, were limited to piracy, violations of safe conduct, and offenses against ambassadors. *Id.* at 720. Among those, the protection of foreign ambassadors was "[u]ppermost in the legislative mind" in drafting the ATS, a concern rooted in the Continental Congress's inability to deal with such offenses. *Id.* The inability to protect foreign diplomats was demonstrated in an early case in which a French citizen assaulted the Secretary of the French Legion in Philadelphia, which became known as the Marbois incident of 1784. *Respublica v. De Longchamps*, 1 U.S. (Dall.) 111, 111-12 (O.T. Phila.1784). Noting that the "person of a public minister is sacred and inviolable," the Pennsylvania state court found that the assault violated the law of nations and constituted "a crime against the whole world." *Id.* at 116. The state court imposed criminal sanctions, but the Continental Congress could provide no more of a civil remedy than to direct the Secretary of Foreign Affairs to apologize. *Sosa*, 542 U.S. at 717 n.11 (citing 28 Journals of

---

[4] Among these reasons are changes in the prevailing conception of the common law since 1789; the role of the federal courts in making common law after *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); the preference for legislative judgment in recognizing new private causes of action; the collateral consequences for United States foreign relations of making international rules privately actionable; and the lack of any congressional mandate to the judiciary to define new violations of the law of nations. *See Sosa*, 542 U.S. at 725-28.

the Continental Congress 314). As a consequence, the *Sosa* Court noted, the Framers gave the Supreme Court original jurisdiction over cases involving ambassadors. The First Congress then passed the Judiciary Act of 1789, which included a version of the ATS that largely remains unchanged. *Sosa*, 542 U.S. at 717-18.

Therefore, pursuant to *Sosa*'s description of the history of the ATS, it appears that some domestic conduct was contemplated to be a violation of the law of nations at the time of the creation of the ATS, and the ATS was created in part to provide a civil remedy for such a violation.[5] However, we do not need to reach this question of the territorial reach of the ATS at this time for two reasons.[6] First, the harm claimed by Velez began in Ecuador, insofar as she was persuaded to abandon her home there and come to the United States on the basis of false promises. Second, and more to the point, the district court lacked jurisdiction because, as discussed below, Velez's claims do not amount to violations of customary international law.

*Sosa* is consistent with this Circuit's precedent that a "more searching review of the merits" be conducted to evaluate whether a plaintiff sets forth a violation of the law of nations sufficient for ATS jurisdiction. *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995) (citing *Filartiga*, 630 F.2d at 887-88). In *Kadic*, we held that "it is not a sufficient basis for *jurisdiction*

---

[5] As *Sosa* further instructs, Congress may "at any time" preclude the application of customary international law to a particular situation "by treaties or statutes that occupy the field." *Id.* at 731; *accord Oliva v. U.S. Dep't of Justice*, 433 F.3d 229, 233-34 (2d Cir. 2005) (collecting cases).

[6] Although the district court held that the ATS exclusively applies to conduct occurring outside the United States, the statute's extraterritorial reach is currently at issue before the Supreme Court. *See Kiobel v. Royal Dutch Petroleum Co.*, 132 S. Ct. 1738 (U.S. 2012) (mem.) (directing parties to file supplemental briefs addressing whether the ATS "allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States").

11

to plead merely a colorable violation of the law of nations," *id.* (emphasis added), and therefore "[t]here is no federal subject-matter jurisdiction under the Alien Tort Act unless the complaint adequately pleads a violation of the law of nations (or a treaty of the United States)," *id.* at 238-39 (noting that if the court's inquiry into international law "discloses that the defendant's alleged conduct violates" customary international law, "then federal jurisdiction exists"); *see Vietnam Ass'n*, 517 F.3d at 123 ("Because we cannot find that Plaintiffs have grounded their claims arising under international law in a norm that was universally accepted at the time of the events giving rise to the injuries alleged, the courts are without jurisdiction under the ATS to consider them." (citing *Sosa*, 542 U.S. at 725)).  Thus, Velez's styling of her claims as forced labor and trafficking is not sufficient to establish jurisdiction.  Assuming, without deciding, that we were persuaded that certain types of "forced labor" and "trafficking" are prohibited by international law as definitely and widely as *Sosa* requires, *see* 542 U.S. at 725, we must review the particular conduct demonstrated in the record more closely.[7]  When we do that here, we conclude that

---

[7]  We recognize our disagreement with the Ninth Circuit, which holds that ATS jurisdiction is proper as long as the allegations are not "wholly insubstantial and frivolous." *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1200 (9th Cir. 2007) (internal quotation marks omitted); *see John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1005-06 (S.D. Ind. 2007) (relying on *Sarei* to hold that "it should be sufficient that plaintiffs allege an arguable violation of the law of nations" to establish jurisdiction under the ATS). The Ninth Circuit in *Sarei* relied on its precedent interpreting the jurisdictional grant of 28 U.S.C. § 1331 and its interpretation of *Sosa*'s suggestion that federal jurisdiction may alternatively be based in § 1331 if a federal court finds an international law violation. *See Sarei*, 487 F.3d at 1200-01 & n.5. *Kadic*, however, expressly requires us to go beyond the requirements of "arising under" jurisdiction under § 1331, and we think this heightened review best comports with *Sosa*. *Kadic*, 70 F.3d at 238; *see Sosa*, 542 U.S. at 738 (examining the complaint in "greater detail" before determining that the plaintiff's "single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy" through jurisdiction under the ATS). Further, *Sarei* involved a motion to dismiss, while we are reviewing a decision on summary judgment.

Velez has not established jurisdiction under the ATS because the record does not support a finding that the defendants violated a norm of customary international law.

To demonstrate a violation of the law of nations, a plaintiff must prove a violation of international law norms that (1) are norms of "international character" that nations abide by out of a sense of legal obligation; (2) are "defined with a specificity comparable to the 18th-century paradigms discussed in *Sosa*"; and (3) are "of mutual concern" to nations. *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 174 (2d Cir. 2009); *accord id.* at 192 (Wesley, J., dissenting); *see Kiobel*, 621 F.3d at 131 ("To attain the status of a rule of customary international law, a norm must be 'specific, universal, and obligatory.'" (quoting *Sosa*, 542 U.S. at 732)).

This Court has "long recognized as authoritative the sources of international law identified in Article 38 of the Statute of the International Court of Justice," which include "international conventions . . . establishing rules expressly recognized by the contesting states," "international custom," "the general principles of law recognized by civilized nations," and certain "judicial decisions and teachings of the most highly qualified publicists . . . of the various nations, as subsidiary means for the determination of rules of law." *Kiobel*, 621 F.3d at 132 (emphasis omitted) (internal quotation marks omitted) (quoting the Statute of the International Court of Justice art. 38, June 26, 1945, 59 Stat. 1055, 1060, 33 U.N.T.S. 993); *see id.* at 137 ("Although all treaties ratified by more than one State provide *some* evidence of the custom and practice of nations, a treaty will only constitute *sufficient proof* of a norm of *customary international law* if an overwhelming majority of States have ratified the treaty, *and* those States uniformly and consistently act in accordance with its principles." (internal quotation marks and citation omitted)).

13

### A. Slavery, Forced Labor, and Involuntary Servitude

This Court has previously recognized that the traditional notion of slavery, in which one human being purports to own another, constitutes a violation of customary international law. *See Kadic*, 70 F.3d at 239. Indeed, the prohibition of slavery is "one of the most well-established customary rules" in international law. Yasmine Rassam, *Contemporary Forms of Slavery and the Evolution of the Prohibition of Slavery and the Slave Trade Under Customary International Law*, 39 Va. J. Int'l L. 303, 310-11 (1999); *see also* Slavery, Servitude, Forced Labour and Similar Institutions and Practices Convention of 1926, Sept. 25, 1926, 60 L.N.T.S. 253 (committed to by 99 countries, including the United States).

The international prohibition against slavery has evolved to encompass more modern variants such as forced labor and servitude.[8] An early marker of this development was the Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery ("Supplementary Convention"), which denounced forms of coerced servitude mirroring slavery, including any "practice whereby a child or young person under the age of 18 years[] is delivered by either or both of his natural parents or by his guardian to another person, whether for reward or not, with a view to the exploitation of the child or young person or of his labour." Supplementary Convention art. 1(d), Sept. 7, 1956, 226 U.N.T.S. 3 (committed to by 123 countries, including the United States). Following the extensive use of forced labor during World War II, the London Charter, which authorized the punishment of war

---

[8] Although Velez makes separate claims of involuntary servitude and forced labor, these terms are frequently used interchangeably, and the concepts overlap. For example, Black's Law Dictionary defines involuntary servitude as "[t]he condition of one forced to labor—for pay or not—for another by coercion or imprisonment." Black's Law Dictionary 1493 (9th ed. 2009). We focus below, as the district court did, on Velez's forced labor claim, but our conclusions also apply to her claim of involuntary servitude.

criminals and "crystalliz[ed] preexisting customary international law" concerning fundamental human rights, *Kiobel*, 621 F.3d at 133 (internal quotations omitted), provided for individual liability for the crimes of deportation for slave labor and enslavement of the civilian population. Charter of the International Military Tribunal - Annex to the Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis art. 6, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279.

The United Nations International Labour Organization ("ILO") has addressed forced labor as a distinct international violation, defining forced labor as "all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily." International Labour Organization Convention No. 29 Concerning Forced or Compulsory Labour art. 2, June 28, 1930, 39 U.N.T.S. 55 ("ILO Convention 29"). According to the ILO Convention 29, forced labor "for the benefit of private individuals, companies or associations" is also prohibited, and ratifying members of the ILO agreed to end this type of forced labor within their respective borders. *Id.* art. 2.[9] The ILO's Abolition of Forced Labour Convention of 1957 prohibited ratifying nations' use of forced labor for specific ends, including economic development and political coercion. International Labour Organization Convention No. 105 Concerning the Abolition of Forced Labour art. 1, June 25, 1957, 320 U.N.T.S. 291.

---

[9] Although 175 countries have ratified this convention, the United States is not one of them. We need not—and do not—decide whether ILO Convention 29 expresses customary international law, *see Sosa*, 433 F.3d at 725 (discussing the specificity with which an international law norm must be defined to provide a viable basis for an ATS claim), because, even assuming that it does, Velez has still failed to establish a triable issue on such a forced labor claim.

15

Assuming, without deciding, that these sources suffice to demonstrate a firmly established consensus in international law prohibiting slavery and the related practices of forced labor and involuntary servitude, the norm prohibiting these practices is limited to certain types of conduct, and a review of the facts presented by Velez does not demonstrate a violation of this norm.[10]

To determine what constitutes forced labor under international law, we turn once again to the ILO. ILO Convention 29's definition of forced labor can be broken into three elements: "(1) work or service performed; (2) under the menace of any penalty; (3) for which the person has not offered himself or herself voluntarily." International Labour Organization, Casebook of Court Decisions 12 (2009) [hereinafter, ILO Casebook]. In a subsequent report on ILO Convention 29, the ILO lists as one of the indicators of forced labor "[p]sychological compulsion, i.e. an order to work, backed up by a credible threat of a penalty for non-compliance." ILO, *A Global Alliance Against Forced Labour* 6 (2005), http://www.ilo.org/ public/english/standards/relm/ilc/ilc93/pdf/rep-i-b.pdf [hereinafter, ILO Report]; *see Bridgestone*, 492 F. Supp. 2d at 1013 (citing the ILO Report). The "menace of any penalty" element does not necessarily need to be a physical penalty but can include credible threats of financial penalties, denunciation to immigration authorities, and deportation. ILO Report at 6. Labor can also be "forced" if it takes place in a "climate of fear" in which consent is impossible, even if the victim was not threatened directly with any penalty. *Prosecutor v. Krnojelac*, Case

---

[10] Whether the international community proscribes forced labor by a state and by private actors need not be resolved because the conduct here does not amount to forced labor, regardless of the status of the perpetrator.

16

No. IT-97-25, Appeals Judgment ¶ 194 (Int'l Crim. Trib. for the Former Yugoslavia Sept. 17, 2003).

According to the ILO, however, the international definition of forced labor (as formulated in the international instruments described above) does not cover "low wages or poor working conditions," even though some domestic legislation considers that kind of environment to constitute forced labor. ILO Report at 5. It also does not include "situations of pure economic necessity" caused by a lack of employment alternatives. *Id.* Instead, pursuant to the various international instruments, forced labor must involve a "severe violation of human rights and restriction of human freedom." *Id.*

In applying the ATS to forced labor claims, courts in the United States have tended to require more than evidence of terrible working conditions and inadequate wages to state a cognizable violation of customary international law. *See, e.g.*, *Bridgestone*, 492 F. Supp. 2d at 1012, 1016 (dismissing forced labor claims of workers on a Liberian rubber plantation because they alleged only "matters of wages and working conditions that fall outside any specific, universal, and obligatory understanding of the prohibition against forced labor"). Decisions in which ATS forced labor claims have been permitted to proceed have typically involved egregious violations of human dignity. *See Licea v. Curacao Drydock Co.*, 584 F. Supp. 2d 1355, 1361-63 (S.D. Fla. 2008) (describing how plaintiffs were held in captivity; how they suffered severe injuries due to the nature of their work but were denied medical treatment; and how in escaping, they risked imprisonment and death and the persecution of their families by the Cuban government); *Doe I v. Reddy*, No. C 02-05570, 2003 WL 23893010, at *9 (N.D. Cal. Aug. 4, 2003) (finding that allegations sufficed both to provide jurisdiction and state claims for forced labor, debt bondage, and trafficking under the ATS when they included "coercive conduct

17

through threats, physical beatings, sexual battery, fraud and unlawful substandard working conditions"); *Manliguez v. Joseph*, 226 F. Supp. 2d 377, 381-82 (describing how the plaintiff was often locked in the apartment in which she provided domestic labor, was prohibited from interacting with others, denied medications and basic personal effects, and was often given only one meal per day).

Even when all inferences are drawn in Velez's favor, the conduct demonstrated in the record does not amount to forced labor under international law. Velez presents no evidence of actual physical abuse or confinement.[11] While she testified in her deposition that she was afraid that Sanchez was about to strike her at times, she conceded that she did not fear violence. The only specific acts of actual or threatened physical contact described by Velez occurred when Sanchez and Munoz each grabbed Velez's arm during the November 8th confrontation. Even if these acts amounted to physical force, however, the degree of force was not severe. Moreover, Velez left the Sanchez household very shortly after these incidents. This indicates that the "menace of penalty" of physical violence did not compel Velez to work, but rather, inspired her to quit.

Velez also does not claim that she was ever denied food or basic living conditions. Although Velez was socially isolated to some degree, she was never locked in the Sanchez house and had access to her passport. She was also allowed to leave the house to visit friends, attend social outings, and participate in classes without supervision. Although Sanchez and Shari Munoz made disparaging remarks to Velez and told her that they owned her and controlled her,

---

[11] Although there is evidence in the record that on November 8, 2003, Sanchez directed Velez to stay in a room until she was given permission to leave, there is no evidence that Velez was confined in the room or that she subjectively felt confined in the room.

these statements, without more, are insufficient to constitute the type of psychological compulsion that is indicative of forced labor in light of all the circumstances here. Additionally, the claim that Sanchez eavesdropped on Velez's telephone calls with her family in Ecuador is insufficient to support a forced labor claim. Velez herself never said that the purported eavesdropping compelled her to continue working in the Sanchez home. At most, Luis Munoz testified in his deposition that he never learned about Velez's working conditions in the United States because Velez censored herself while Sanchez listened to their conversations. Quite apart from the question of whether Luis Munoz would be competent to testify to whether Velez was censoring herself during their conversations, without any explanation from Velez as to how this "forced" her to work or constituted a "menace of penalty," the asserted eavesdropping plainly does not create a triable ATS claim.

Finally, while Velez asserts that the defendants threatened to send her back to Ecuador, they never threatened to report her to immigration authorities, which might have led to imprisonment and confinement. The harm that she would have suffered from returning to Ecuador does not amount to a "menace of penalty" sufficient to consider her continued labor as "forced." Further, once these threats were made in November 2003, Velez quickly left the Sanchez home. *Cf. United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008) (affirming forced labor criminal prosecution where evidence showed that defendants "intentionally manipulated" an immigrant domestic worker by convincing her that leaving their employ would be illegal and result in deportation). Velez herself admitted that the main consequence of being sent back to Ecuador would be that she could not continue to live in the United States. Therefore, her situation as she describes it was one of "pure economic necessity" at most, not

19

one of a severe deprivation of human rights. We cannot find any authority in international law to support the conclusion that the harm she suffered was the type of harm targeted by the international conventions described above.

We do not take lightly the challenges that Velez faced in leaving the Sanchez household—her age, immigration status, language skills, and lack of other family and friends on whom to depend may have made remaining in the United States difficult. Nor do we decide here that forced labor must always involve actual or threatened physical abuse or violence. But it is clear that the harm Velez claims to have suffered was not the type of harm contemplated by the international community's prohibition of slavery and its modern variants of forced labor and involuntary servitude, even if we assume that the prohibition of these modern variants is firmly established by international law. In light of the Supreme Court's direction in *Sosa* for "vigilant doorkeeping," 542 U.S. at 729, we cannot conclude on this record that a violation of the law of nations occurred here, and therefore we affirm the district court's dismissal of Velez's slavery, forced labor, and involuntary servitude claims on this basis.

### B. Human Trafficking

International prohibitions against human trafficking also date back to the movement against slavery and slave trading; for example, the Slavery Convention of 1926 specifically notes an intention of ending the "traffic" of African slaves, and the Supplementary Convention's article 3 makes the conveyance of slaves from one country to another a criminal offense under the laws of the parties to the Convention. Addressing trafficking was of such importance to the international community in the early twentieth century that the League of Nations concluded the 1921 Convention for the Suppression of Traffic in Women and Children and the 1933

International Convention for the Suppression of the Traffic in Women of Full Age. These conventions were later consolidated into the United Nations Convention for the Suppression of the Traffic in Persons and of the Exploitation of the Prostitution of Others ("Trafficking Convention"), which notes that the "traffic in persons for the purpose of prostitution" is "incompatible with the dignity and worth of the human person." Trafficking Convention, preamble, Mar. 21,1950, 96 U.N.T.S. 271. The Rome Statute establishing the International Criminal Court in 1998 also defined "enslavement" as a crime against humanity that included the exercise of the powers of ownership over a person "in the course of trafficking in persons, in particular women and children." Rome Statute of the International Criminal Court of 1998 arts. 7(1)(c), 7(2)(c), July 17, 1998, 2187 U.N.T.S. 3.

The most recent effort to address trafficking internationally is the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children - Annex II to the United Nations Convention Against Transnational Organized Crime ("Palermo Protocol"), G.A. Res. 55/25, U.N. Doc. A/RES/55/25 (Jan. 8, 2001) (ratified by the United States). Article 5 of the Palermo Protocol requires that trafficking be criminalized in domestic legislation. *Id.* art. 5. Over 100 countries, including the United States, are signatories to the Protocol. The Palermo Protocol defines trafficking in persons as follows:

> the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs.

*Id.* art 3. The United Nations Office on Drugs and Crime concludes from this language that an

element of the crime of trafficking is the purpose for which a person is trafficked—that is, the ultimate exploitation suffered. Human Trafficking, United Nations Office on Drugs and Crime, http://www.unodc.org/unodc/en/human-trafficking/what-is-human-trafficking.html.

Assuming without deciding that the Protocol states customary international law, we necessarily conclude that Velez fails to establish a viable ATS claim for human trafficking in connection with her transportation from Ecuador to the United States because, as described above, she was not subject to the minimum forms of exploitation encompassed by the Protocol. Therefore, we affirm the district court's dismissal of her ATS trafficking claim for lack of subject matter jurisdiction on this basis.

**II.     Claims Under the TVPRA**

The district court held that, even if the ATS were to provide jurisdiction over torts based on domestic conduct, the TVPRA implicitly withdrew ATS jurisdiction over these claims. *See* Pub. L. No. 108-193, § 4(a)(4), 117 Stat. 2875, 2877 (2003) (codified at 18 U.S.C. § 1595) (amending the Trafficking Victims Protection Act by creating a private right of action for any "individual who is a victim of a violation" of the federal criminal laws prohibiting human trafficking and forced labor). After holding that the TVPRA preempts Velez's ATS claims, the district court restyled her claims as arising under the TVPRA. *Velez*, 754 F. Supp. 2d at 498 (citing *Harary v. Blumenthal*, 555 F.3d 1113, 1115 n.1 (2d Cir. 1977) for the principle that a claim need not be dismissed for an insufficient jurisdictional allegation as long as the complaint provides sufficient factual pleadings from which federal jurisdiction can be inferred). Although Velez did not raise claims under the TVPRA in her amended complaint, "the failure in a complaint to cite a statute, or cite the correct one, in no way affects the merits of a claim,

22

because factual allegations alone are what matters." *Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 104 (2d Cir. 2005) (internal quotation marks and citation omitted).

Since we affirm the dismissal of the ATS claims for lack of jurisdiction, we do not address the issue of preemption, although we note that neither the plain language nor the legislative history of the TVPRA references the ATS. *See Hui v. Castaneda*, 130 S. Ct. 1845, 1853 (2010) ("[R]epeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest." (internal citation omitted)). Regardless, the district court should not have considered Velez's claims under the TVPRA because the TVPRA does not apply retroactively to her claims.

The Trafficking Victims Protection Act was enacted in 2000, and the amendment creating its civil cause of action (part of the TVPRA), codified at 18 U.S.C. § 1595, was enacted only in December of 2003 and amended in December of 2008. Pub. L. No. 108-193, § 4(a)(4), 117 Stat. at 2877; Pub. L. No. 110-457, § 221, 122 Stat. 5044, 5067 (2008) (amending the civil cause of action to remove references to specific crimes and therefore expanding its scope to include forced labor). Velez left Sanchez's home in November 2003, and thus all of the alleged trafficking and forced labor took place before the civil cause of action under the TVPRA was enacted.

There is a well-established presumption against the retroactive application of legislation, including amendments creating a private cause of action. *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 950 (1997); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 284-86 (1994) (holding that a 1991 amendment permitting compensatory damages for violations of the Civil Rights Act of 1964 did not apply retroactively). *Landgraf* commands this Court to apply a

23

two-part test to determine retroactivity. First, we must determine whether Congress has "expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at 280. If not, then we must evaluate "whether [the statute] would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.*

Nothing in the language of the TVPRA or its legislative history indicates that Congress intended retroactive application. Thus, the first prong of *Landgraf* is not met. As to the second prong, while criminal liability may have existed prior to the 2003 amendments, the civil remedy added in 2003 fits within the *Landgraf* definition of "impermissibly retroactive legislation" because it increases a party's liability for previously occurring conduct. *Hughes*, 520 U.S. at 946. *Compare Doe v. Siddig*, 810 F. Supp. 2d 127, 135 (D.D.C. 2011) (rejecting the retroactive applicability of the TVPRA's civil cause of action because it "represented a significant expansion of civil liability"), *and Nattah v. Bush*, 770 F. Supp. 2d 193, 205 (D.D.C. 2011) (finding that the civil cause of action did not cover conduct occurring in July 2003), *with Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 683 (S.D. Tex. 2009) (holding that 18 U.S.C. § 1596, a provision that merely expanded federal courts' jurisdiction to extraterritorial violations under the TVPRA without giving plaintiffs new substantive rights, applied retroactively). At least one other Court of Appeals has reached the same conclusion. *Ditullio v. Boehm*, 662 F.3d 1091, 1100-02 (9th Cir. 2011) (holding that Section 1595 does not apply retroactively to conduct occurring before December 19, 2003 because "[i]t changed substantive law and attached new legal burdens to violations of the [TVPRA]").

Since the civil cause of action does not apply retroactively to Velez's claims, we affirm the district court's dismissal of her claims under the TVPRA on that basis.

24

**III.  Minimum Wage Under the FLSA**

The district court also granted summary judgment on Velez's FLSA claim against Sanchez because it concluded that there was no genuine dispute of fact that Velez was "a member of the Sanchez household" and "not an employee." *Velez*, 754 F. Supp. 2d at 499. Velez argues that she was an "employee" within the meaning of the FLSA notwithstanding her familial relationship and therefore is entitled to pursue her claim for minimum wage for the household work that she performed. We conclude that there is a genuine dispute as to whether she was an employee of Sanchez under the FLSA and thus reverse the district court on that basis.

The FLSA is construed "liberally to apply to the furthest reaches consistent with congressional direction" to accomplish the FLSA's purposes. *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985) (citation omitted). Enacted in 1938, the FLSA "set up a comprehensive legislative scheme" in part to prevent the production of goods under labor conditions that were "detrimental to the maintenance of the minimum standards of living necessary for health and general well-being." *United States v. Darby*, 312 U.S. 100, 109 (1941). The FLSA was intended to protect workers from substandard conditions and the "fair-minded" employer from unfair competition. S. Rep. No. 93-690, at 4 (1974). The FLSA and its subsequent amendments prohibited child labor, required overtime pay for certain jobs, and established a minimum wage. 29 U.S.C. §§ 203, 206, 207.

In 1974, Congress amended the FLSA to extend the minimum wage protection to domestic workers. Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, § 7, 88 Stat. 55, 62 (1974). Congress found that "a living wage and respectable working conditions [were] vital" to developing "an effective and dignified domestic workforce" that at the time constituted 2.4 million workers. S. Rep. No. 93-690, at 19-20. The domestic worker provision governs a

worker who in any workweek "is employed in domestic service in one or more households," and who either (1) receives sufficient compensation per calendar year such that his compensation would constitute wages under the Social Security Act or (2) provides the domestic services for more than eight hours per week. 29 U.S.C § 206(f).

The Department of Labor has promulgated regulations defining the statutory term "domestic service employment" as "services of a household nature," including cooking and babysitting on a more-than-casual basis, for an employer. 29 C.F.R. § 552.3 (2012). The parties agree that Velez performed services of this nature, although they dispute the amount of services she provided. The central issue on this aspect of her appeal is whether Velez was "employed," that is, whether she and Sanchez shared an employee-employer relationship.

The nature of the relationship between Velez and Sanchez depends on its "'economic reality.'" *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). The determination of whether an employer-employee relationship exists does not depend on "isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008) ("[T]his court has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of circumstances."). As we explained in *Zheng*, this Court has applied at least two tests with different purposes in determining the economic reality of a relationship. The test applied by the district court here, tracing back to *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984), evaluates whether the alleged employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained

26

employment records." *Id.* at 12 (borrowing factors from *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985)). None of these factors is dispositive. *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). The *Carter* test is typically used to determine whether an entity can be considered a joint employer, in addition to the primary employer. *Zheng*, 355 F.3d at 67.

The second test, set out in *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988), is broader and typically more relevant for distinguishing between independent contractors and employees. *Zheng*, 355 F.3d at 67-68. In *Brock*, this Court considered "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business" in determining whether nurses engaged by a health-care service were employees or independent contractors. *Brock*, 840 F.2d at 1058-59. The *Brock* test is less useful here because, as this Court stated, the "ultimate concern" in distinguishing independent contractors and employees is whether the workers "depend upon someone else's business for the opportunity to render service or are in business for themselves," and the *Brock* factors address that concern. *Brock*, 840 F.2d at 1059. Here, the question is not whether Velez was dependent upon Sanchez for work opportunities but is whether Velez was an employee. Velez argues that neither *Brock* nor *Carter* should apply and that the district court should have instead focused on "whether there was an expectation or contemplation of compensation" and whether Sanchez received "immediate advantage from any work" performed by Velez. *Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 533 (S.D.N.Y. 1998).

27

This Court has not clarified the test to determine the "economic reality" in a domestic service context, although at least one district court in this Circuit has applied the *Carter* test in a case involving a live-in domestic service worker. *Campos v. Lemay*, No. 05 civ. 2089, 2007 WL 1344344, at *3 (S.D.N.Y. May 7, 2007) (also noting that "[t]he proper inquiry is whether the alleged employer possessed the power to control the workers in question" (internal quotation marks omitted)). At least one other Court of Appeals has applied factors similar to those listed in *Carter* in the domestic service context. *Rodriguez v. Jones Boat Yard, Inc.*, 435 F. App'x 885, 888 (11th Cir. 2011) (per curiam).

The district court here concluded that the *Carter* test applied but determined that Velez was "a member of the Sanchez household" and therefore not an employee. *Velez*, 754 F. Supp. 2d at 499. The district court found that the economic reality of the situation was that Velez was a part of the family because (1) Velez thought of Sanchez as a sister and valued that relationship; (2) Velez received gifts and opportunities outside of the home; and (3) Velez did not leave the Sanchez household when she did not receive wages. While these circumstances may support the defendant's argument that a familial relationship existed, they do not, either individually or in combination, summarily preclude Velez from being an employee under the FLSA as a matter of law.

First, that Velez had family ties to Sanchez does not preclude the application of the FLSA. It is true that the FLSA exempts from coverage "mom-and-pop" establishments. *See* 29 U.S.C. § 203(s)(2). Under this exception to coverage by the FLSA, any establishment "that has as its only regular employees" immediate family members is not an "enterprise engaged in commerce or in the production of goods for commerce." *Id.* Such a business would be

exempted from the minimum wage requirement for enterprises. *See* 29 U.S.C. § 206(a). But as the district court correctly noted, the domestic worker provision under which Velez brings her claim does not depend on whether her employer is an enterprise engaged in commerce or the production of goods for commerce. Instead, it covers any employee engaged in domestic service "in a household." 29 U.S.C. § 206(f). The plain language of the FLSA makes clear that the "mom-and-pop" exception is cabined to those FLSA provisions that relate to enterprises as defined by § 203(s)(2), and thus there is no such exception for domestic workers.[12]

Although recognizing that the FLSA does not exempt family members from the domestic worker provision, the district court cited to evidence that Velez considered Sanchez a sister and valued that relationship with Sanchez to support its conclusion that she was not an employee. However, the existence of such a relationship, or some motivation to work in addition to material gain, does not preclude the application of the FLSA. *See Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 524 (6th Cir. 2011) (stating that resolving this issue by "reference to labels used by the parties is inappropriate" and urging courts to resist categorical labeling). For example, the Supreme Court has held that trainees in a religious foundation's rehabilitation program were employees even though they considered themselves volunteers. *Alamo*, 471 U.S. at 300-01. Although many of the trainees in *Alamo* claimed to be "working only for religious and evangelical reasons," some of the employees were "entirely dependent upon the Foundation for long periods, in some cases several years." *Id.* at 293, 301 (internal quotations omitted). Similarly, evidence that Velez worked at least in part because she had an emotional tie with Sanchez's children and may have had a familial relationship with Sanchez does not preclude the

[12] Congress also excluded immediate family members engaged in agriculture from the definition of employee under the FLSA, but made no such exception for family members engaged in domestic service. 29 U.S.C. § 203(e)(3).

application of the FLSA if the totality of the circumstances supports a preponderance finding of an employer-employee relationship.

The line between member of the household and employee becomes especially difficult to discern in the domestic worker context because, as one court stated, the work of a domestic service employee would otherwise be "carried out in most homes by the family members themselves" if the family could not afford to pay outside help. *Marshall v. Cordero*, 508 F. Supp. 324, 325 (D.P.R. 1981). However, Congress chose to provide protections for those workers who are not providing that service in the course of purely familial duty, even though it was well aware that difficult distinctions would have to be drawn. *See* 119 Cong. Rec. 24,799 (1973) (statement of Sen. Harrison Williams) (rejecting the notion that the domestic worker provisions of the FLSA would govern a parent's children mowing the lawn, even though the provisions do not exclude family members); 119 Cong. Rec. 24,801 (1973) (statement of Sen. Jacob Javits) (recognizing as a question of fact whether a person is "actually employed rendering a domestic service" or whether he is providing such services incidentally while making that residence his home for a period of time). Thus, the defendants' focus on the nature of Velez's work as simply "chores," and the fact that members of the household can and did take part in that work, is insufficient to permit the matter to be resolved as a matter of law because such a focus would preclude most domestic worker claims under the FLSA.

Further, the fact that Sanchez provided "dispensations" to Velez does not preclude the FLSA claim, particularly to the extent that Velez was dependent upon those benefits. *Velez*, 754 F. Supp. 2d at 499. In *Alamo*, the workers did not receive cash salaries but received "food, clothing, shelter, and other benefits." *Alamo*, 471 U.S. at 292. The Supreme Court considered compensation that the trainees received in the form of benefits rather than cash as "wages in

another form." *Id.* at 301; *see also Lopez v. Rodriguez*, 500 F. Supp. 79, 81 (D.D.C. 1980), *aff'd in part by Lopez v. Rodriguez*, 668 F.2d 1376 (D.C. Cir. 1981) (finding damages in FLSA action in spite of the fact that the plaintiff "received room, board, miscellaneous clothing and toiletries, medical expenses and minimal pocket money" while performing live-in domestic services). The Department of Labor also contemplates these types of benefits to be part of compensation, allowing employers of domestic workers to take credit in meeting their wage responsibilities for food, lodging, and facilities such as drugs, cosmetics, and drycleaning. 29 C.F.R. § 552.100(b).

That Velez chose to remain at Sanchez's house even though she did not receive compensation for her work is also not dispositive. *Velez*, 754 F. Supp. 2d at 499. Velez presented evidence that she remained in Sanchez's house in part because she had few friends, no money, poor language skills, and little prospect as a teenage illegal immigrant to find work to support herself outside of the household. *See, e.g.*, Velez Dep. at 565. Workers who do not leave harmful or illegal working conditions because they are unable to find alternatives to support themselves can still be covered by the FLSA. *See Lopez*, 500 F. Supp. at 81 (finding damages in an FLSA action against defendants who arranged for a housekeeper to move from Bolivia to live with them and then "exploited for their own purposes a young, poorly educated, naive alien who was completely at their whim and mercy").

Thus, the district court's conclusion was based on factors that individually do not preclude the application of the FLSA and together do not consider the totality of the circumstances in this case. The following factors, drawn from the various decisions discussing the test for "economic reality" in different contexts, are particularly relevant for distinguishing a domestic service worker from a member of a household who incidentally performs household

31

tasks. First, borrowing from *Carter*, we believe that the alleged employer's ability to hire and fire the worker weighs in favor of an employment relationship. *See* 735 F.2d at 12. A household worker who was solicited or referred to fill a position is also more likely to be a covered employee than a family guest invited to stay at a household and asked to participate in the chores. Similarly, a person who must leave the living arrangement when he stops providing services is more likely an employee than someone who can continue to stay in the household without performing those tasks.

A defendant's ability to set the hours, duration, and terms of a plaintiff's services would also speak to an employment relationship. A member of the household usually exerts some degree of control over the hours he spends completing household tasks and which tasks he takes on. In the same vein, although a plaintiff must meet a threshold of either yearly compensation or weekly hours worked to be eligible for FLSA coverage, the extent to which a plaintiff provides services beyond those thresholds is also a relevant factor. As the Department of Labor explained in interpreting the exemption for babysitting provided on a casual basis, the rationale for that exemption was that casual babysitters, such as teenagers working after school, are not dependent upon their income from these services for their livelihood and do not provide these services as a vocation. *See* 29 C.F.R. § 552.104(a). Although this categorical exemption for casual babysitters may not apply to Velez (who claims that she worked full-time and provided services other than babysitting), the total number of hours that she devoted to the work and how she distributed those hours is probative.

Employment records are also a relevant consideration, although under the regulations promulgated by the Department of Labor an employer is required to maintain records of the hours worked by nonresidential domestic workers but not of live-in domestic service employees.

32

29 C.F.R. § 552.110(b). Thus, a lack of such records is not a useful indicator that an employment relationship does not exist; however, the existence of these records would weigh in favor of finding an employment relationship.

While the lack of a regular salary is not dispositive as pointed out in *Alamo*, the existence of a salary arrangement would be significant. Even if the employee never received any actual compensation, the *promise* of compensation, particularly in the form of a regular salary, is a factor in favor of finding an employment relationship. *See Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947) (noting that the FLSA "was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another").

A court should also consider who is the primary recipient of benefits from the relationship.[13] This is the approach taken by courts determining if trainees and students providing services as part of their education are also employees. For example, the Eighth Circuit determined that a boarding school requiring its students to do chores was not employing the students because "the chores were intended to instill in each student a sense of teamwork, responsibility, accomplishment, and pride" and thus ultimately benefitted the student. *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005); *see also Solis*, 642 F.3d at 528-29 (listing cases in which courts balance the benefits accrued by each party).

Although Velez's familial relationship with Sanchez is not preclusive of an employment relationship, a court should also consider the history and nature of the relationship between the parties and their interactions during Velez's time at Sanchez's house. For example, if Sanchez

---

[13] This consideration will help distinguish, for example, children who were promised an allowance for their participation in household chores for over eight hours a week, who perform those chores as part of their membership in the household, from domestic workers.

was taking Velez to movies and other entertainment and including her in holiday celebrations, then that could be a factor against the finding of an employment relationship. We emphasize again, though, that relatives are not categorically excluded from the protections of the FLSA domestic worker provision.

In summary, the following factors are useful to a district court evaluating a minimum wage claim under the FLSA's domestic worker provision: (1) the employer's ability to hire and fire the employee; (2) the method of recruiting or soliciting the employee; (3) the employer's ability to control the terms of employment, such as hours and duration; (4) the presence of employment records; (5) the expectations or promises of compensation; (6) the flow of benefits from the relationship; and (7) the history and nature of the parties' relationship aside from the domestic labor. Of course, a court must not apply these factors rigidly, and the list is not all-inclusive. *Herman*, 172 F.3d at 139 ("[T]he 'economic reality' test encompasses the totality of circumstances, no one of which is exclusive. Since economic reality is determined based upon *all* the circumstances, any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition."). However, in the absence of further guidance from the Department of Labor, we believe that these factors provide a better understanding of the totality of the circumstances for a domestic worker than those chosen by the district court.

With these factors in mind, and viewing the record evidence in the light most favorable to Velez, we identify genuine disputes of material fact as to the "economic reality" of Velez's situation. Velez has presented evidence that, from the beginning of their work relationship, Sanchez specifically promised Velez wages in addition to room and board and encouraged her to come to the United States. There is also evidence that Velez was solicited as part of a more

34

general search for an employee. Once Velez was in the United States, Sanchez exercised considerable control over the status of her employment, including specific hours and duties. The hours that Velez claims she provided child care were determined entirely by Sanchez's work schedule and leave decisions. The evidence that Sanchez claimed to "own" Velez and could send her back to Ecuador at any time indicates that Sanchez could terminate the relationship at will. Sanchez, on the other hand, disputes Velez's reasons for immigrating and leaving, her activities in the household, and the nature of their relationship. Factual questions also remain regarding the document that Sanchez allegedly drafted before Velez left promising to pay wages and including certain terms of employment.

Once these issues are resolved, it may be the case that the totality of the circumstances still demonstrate that Velez was not an employee. However, this cannot be determined as a matter of law without resolving the factual disputes. We therefore vacate the district court's grant of summary judgment against Velez as to her FLSA claim and remand for further proceedings.[14]

## IV. Breach of Contract

Finally, Velez appeals the district court's dismissal of her breach of oral contract claim under New York law. The district court held that the oral contract was void because full performance of the contract, including full payment of Velez's college education, was not

---

[14] In pursuing summary judgment, the defendants have not questioned Velez's entitlement to backpay because of her undocumented status while she worked in the Sanchez household. *See generally Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 149 (2002) (holding that backpay awards to undocumented workers terminated in violation of the National Labor Relations Act ran counter to federal immigration law); *cf. Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 243 (2d Cir. 2006) (noting that majority of courts to address the question have concluded that *Hoffman Plastic* does not preclude FLSA awards for backpay). We therefore do not consider the issue further. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

possible within a year and thus violated the New York Statute of Frauds, N.Y. Gen. Oblig. Law § 5-701(a)(1) (McKinney 2002) (stating that an oral agreement is void if "[b]y its terms is not to be performed within one year from the making thereof"). Therefore, the court dismissed her breach of contract claim for failure to state a claim pursuant to Rule 12(b)(6).

The New York Statute of Frauds "encompasses 'only those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year.'" *Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007) (quoting *Cron v. Hargro Fabrics, Inc.*, 694 N.E.2d 56, 58 (N.Y. 1998)). Because an at-will employment relationship can be terminated at any time, the New York Court of Appeals has considered at-will contracts to survive the one-year requirement. *Guilbert*, 480 F.3d at 151 (citing *Cron*, 694 N.E.2d at 59). When an at-will contract involves some fixed compensation amount, it still survives the Statute of Frauds requirement if the "measure of compensation has become fixed and earned" within one year. *Cron*, 694 N.E.2d at 60.

Here, Velez's complaint alleged that Velez and Sanchez entered into an employment agreement in which Velez agreed to take care of Sanchez's child in return for weekly wages and the means to complete high school.[15] Velez also claimed that Sanchez promised to pay for Velez's college tuition as part of the package used to entice Velez to come to the United States. While Velez now separates the tuition promise from the other promises, it appears from the amended complaint that Velez made the decision to come to work for Sanchez based on the understanding that her tuition would be paid, making college part of the "bargained-for exchange between the parties." *Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 569 (N.Y. 1978);

---

[15] At the time she left Ecuador, Velez had one and one-half years left to graduate. Am. Compl. ¶ 26.

36

Am. Compl. ¶¶ 11-19 ("Because Ms. Velez wanted to pursue her education in the United States, she accepted Defendant Sanchez's offer.").

The college tuition promise is not analogous to the bonus at issue in *Cron*. While in *Cron* an at-will employment contract that included an annual bonus amount was not barred by the Statute of Frauds because "the measure of defendant's obligation to compensate its employee is fixed within a year," *Cron*, 694 N.E.2d at 61, that would not be the case for Sanchez's obligation to pay for college. Therefore, we affirm the district court's dismissal of Velez's breach of contract claim pursuant to the New York Statute of Frauds.

**V.      Supplemental Jurisdiction over the Remaining State Law Claims**

The district court, in granting summary judgment, declined to exercise supplemental jurisdiction over Velez's state law claims, the defendants' counterclaims, and Sanchez's third-party claims because it had dismissed all claims over which it had original jurisdiction, *see* 28 U.S.C. § 1367(c). Although Velez did not raise this issue in her brief, her notice of appeal indicates that she appeals from the district court's order in its entirety. Because we are remanding Velez's FLSA claim, we also vacate the district court's dismissal of the state law claims and remand to the district court to reconsider supplemental jurisdiction over those claims. *See Adams v. Suozzi*, 517 F.3d 124, 129 (2d Cir. 2008).

**CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's dismissal of Velez's ATS claims and breach of contract claim, and we VACATE and REMAND her FLSA claim and any remaining state law claims over which the district court declined to exercise supplemental jurisdiction.