Martina Aguilar **ARAGON,**
et al., Plaintiffs,

v.

**CHE KU, et al., Defendants.**

Case No. 16–cv–3907 (WMW/KMM)

United States District Court,
D. Minnesota.

Signed September 28, 2017

Daniel R. Olson, Laurel J. Pugh, Mark R. Bradford, Bassford Remele, Phillip F. Fishman, Phillip Fishman Law Office, Rachel Petersen, Rachel Petersen Law Office, Minneapolis, MN, for Plaintiffs.

Britton D. Weimer, Weimer & Weeding Bloomington, MN, William C. Weeding, Mpls, MN, PLLC, for Defendant.

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS

Wilhelmina M. Wright, United States District Judge

In this dispute arising from the conditions of Plaintiffs' employment, Defendants move to dismiss three counts of Plaintiffs' four-count amended complaint for failure to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). (Dkt. 52.) For the reasons addressed below, the Court denies Defendants' motion to dismiss.

## BACKGROUND

Plaintiffs are twelve Latino individuals who are former or current employees of Defendants. Defendants are five Minnesota corporations[1] that operate grocery stores in the Minneapolis–St. Paul metropolitan area (collectively, the "corporate defendants") and two individuals, Che Ku and Leng Ku (collectively, the "individual defendants"), who serve as the chief executive officers of the corporate defendants and are involved in their daily business operations. Most of the plaintiffs have worked for more than one corporate defendant. According to Plaintiffs, Defendants

1. These companies are Star Ocean Food, Inc. (Star Ocean); Sun Foods, Inc. (Sun Foods I); Sun Foods II, Inc. (Sun Foods II); Double Dragon Foods, Inc. (Double Dragon); and Dragon Star Supermarket, Inc. (Dragon Star Supermarket). A sixth corporate defendant, Dragon Star Oriental Foods, Inc., was voluntarily dismissed.

move employees between the stores that Defendants operate and also have, at times, directed some Plaintiffs to perform work at the homes of the individual defendants. Each Plaintiff's dates of employment vary. The longest period of employment extended from 1998 to 2015.

Plaintiffs allege that Defendants engaged in a pattern and practice of discriminatory conduct toward Plaintiffs, including but not limited to physically restraining Plaintiffs at their workplace, implicitly or explicitly threatening Plaintiffs with deportation for failure to cooperate with Defendants, and physically assaulting certain Plaintiffs. For example, eleven Plaintiffs allege that, on multiple occasions during the course of their employment, they were locked in portions of the grocery store, including the freezer. Plaintiffs also allege that Defendants failed to pay overtime; denied Plaintiffs adequate breaks and medical attention; abused or harassed Plaintiffs verbally, physically, and sexually; and threatened to report Plaintiffs to immigration authorities if Plaintiffs did not follow management's instructions or reported their work conditions.

Plaintiffs' amended complaint asserts four counts. Count I alleges that Defendants intentionally discriminated against Plaintiffs based on their Latino origin, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (as amended by the Civil Rights Act of 1991). Count II alleges that Defendants violated "customary well-established and universally recognized international law" prohibiting forced labor pursuant to the Alien Tort Statute (ATS), 28 U.S.C. § 1350. Count III alleges that Defendants engaged in forced labor, a violation of the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1589. And Count IV alleges that Defendants violated the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1964.

Defendants move to dismiss Counts II, III, and IV for failure to state a claim on which relief can be granted.

## ANALYSIS

A complaint must allege sufficient facts such that, when accepted as true, a facially plausible claim to relief is stated. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). If a complaint fails to state a claim on which relief can be granted, dismissal is warranted. Fed. R. Civ. P. 12(b)(6). When determining whether a complaint states a facially plausible claim, a district court accepts as true all of the factual allegations in the complaint and draws all reasonable inferences in a plaintiff's favor. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010). To meet the federal pleading standard, factual allegations must be sufficient to "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" are insufficient, and legal conclusions couched as factual allegations may be disregarded. *See id.*

## I. Blanket Pleading Against Defendants (Counts II, III, and IV)

Defendants assert that Counts II, III, and IV must be dismissed for failure to state a claim because the amended complaint "impermissibly lumps all Defendants together" and fails to provide Defendants fair notice of the grounds for Plaintiffs' claims.

In some circumstances, a complaint fails to state a claim for relief if it "lumps all defendants together and does not sufficiently allege who did what to whom ... because it does not provide fair

notice of the grounds for the claims made against a particular defendant." *Tatone v. SunTrust Mortg., Inc.*, 857 F.Supp.2d 821, 831 (D. Minn. 2012). This District has expressly discouraged complaints that fail "to clearly state which claims are asserted against which Defendant" and thereby require the Court to "seek to divine some clarity out of the pleading." *I.E.C. ex rel. J.R. v. Minneapolis Pub. Sch., SSD No. 1*, 970 F.Supp.2d 917, 928 (D. Minn. 2013) (collecting cases). But the absence of such clarity in pleading does not necessarily result in dismissal. *E.g., id.* ("Despite the failure of pleading clarity here, because there are only three legal claims asserted in this present lawsuit, the Court can readily address each of them.").

For example, in *Qwest Communications Co., LLC v. Free Conferencing*, the district court rejected the defendants' motion to dismiss a complaint that allegedly lumped defendants together. 990 F.Supp.2d 953, 969–70 (D. Minn. 2014). The court observed that, in many cases in which claims have been dismissed on this basis, discrete acts were alleged in the complaint without the complaint identifying the actions attributable to each defendant. *Id.* The plaintiff in *Qwest*, by contrast, specifically alleged that all but one defendant had entered into a contract, alleged when the contract began, and alleged "facts related to all Defendants as the result of their respective contracts." *Id.* at 970. Qwest's pleading, the court concluded, put the defendants on sufficient notice as to which claims were asserted against which defendants, and the court recognized that re-

quiring a plaintiff "to plead each claim and fact separately with respect to each Defendant would create a complaint that would be not only significantly longer, but also unwieldy." *Id.*

■ Here, the amended complaint clearly alleges that each count is directed at each Defendant. There is no need to separately identify each Defendant in each count to understand which counts are alleged against which Defendant because *every* count is asserted against *every* Defendant. *Compare I.E.C. ex rel. J.R.*, 970 F.Supp.2d at 928 (observing that the complaint "fails to clearly state which claims are asserted against which Defendant"), *with Qwest*, 990 F.Supp.2d at 969 (observing that all but one claim was asserted against all defendants).

Defendants' argument fares no better with respect to Plaintiffs' factual allegations. To be sure, the amended complaint includes some allegations that are directed at "Defendants" generally. But the vast majority of Plaintiffs' factual allegations specifically identify which corporate defendants employed a particular Plaintiff and which individual or corporate defendant allegedly participated in the conduct at issue. Moreover, the amended complaint alleges that many of the Plaintiffs worked for more than one corporate defendant. In these circumstances, some level of imprecision is to be expected, at least until the record can be further developed during discovery.[2]

Because Plaintiffs' amended complaint does not impermissibly lump Defendants,

---

**2.** Some of Defendants' arguments suggest that Plaintiffs must plead with a level of particularity akin to that required for fraud claims. *See* Fed. R. Civ. P. 9(b) (providing that, when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake"). Indeed, many of the cases in which courts have criticized "lumping" defendants have involved fraud claims. *E.g., Moua v. Jani–King*

*of Minn., Inc.*, 613 F.Supp.2d 1103, 1111 (D. Minn. 2009) ("Plaintiffs' fraud claims fail to satisfy Rule 9(b) because the allegations cluster all the Defendants together without the required specificity to discern the respective roles of the individual defendants in the alleged fraud scheme."). Here, because the challenged counts do not involve allegations

dismissal of Counts II, III, and IV on this basis is not warranted.

## II. Plaintiffs' ATS Claim (Count II)

Defendants seek dismissal of Plaintiffs' ATS claim, Count II of the amended complaint, for failure to state a claim on which relief can be granted. The ATS provides, in full:

The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350. Defendants advance several alternative grounds in support of their argument for dismissal: (1) Plaintiffs have failed to allege that they are "aliens"; (2) the ATS does not permit claims against private individuals and businesses; and (3) the ATS does not permit a cause of action based on allegations of forced labor and, to the extent that it does, Plaintiffs have not alleged sufficient facts to support such a claim. Each argument is addressed in turn.

### A. Plaintiffs' Alien Status

■ Defendants first contend that Plaintiffs fail to state an ATS claim because, although the amended complaint alleges that Plaintiffs are "Latino" and were born outside the United States, it does not expressly allege that Plaintiffs are not United States citizens and have not been naturalized.

When evaluating a motion to dismiss for failure to state a claim, a district court accepts as true all factual allegations advanced in the complaint and draws all reasonable inferences in the plaintiffs' favor. *Blankenship*, 601 F.3d at 853. Plaintiffs allege that they are Latino, were born outside of the United States, and feared they would be deported if Defendants reported them to immigration authorities. Because the only reasonable inference to be drawn from these factual allegations is that Plaintiffs are aliens, Defendants' motion to dismiss Count II for failure to state a claim on this basis is not warranted.

### B. Claims Against Private Individuals and Corporations

■ ·Defendants assert that "there is a presumption against ATS claims applying to private individuals and businesses." As Defendants acknowledge, the Supreme Court of the United States has not yet addressed corporate liability under the ATS. *See Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 133 S.Ct. 1659, 1663, 185 L.Ed.2d 671 (2013). In *Kiobel*, the Supreme Court granted certiorari to consider whether corporate liability exists under the ATS, but the Court subsequently directed the parties to file supplemental briefs addressing a separate question.[3] *Kiobel*, 133 S.Ct. at 1663. The Supreme Court affirmed the Second Circuit's *Kiobel* decision based on the latter question without addressing the corporate liability issue. *Id.*

■ Absent Supreme Court or Eighth Circuit precedent, Defendants rely solely on the Second Circuit's decision in *Kiobel*.[4]

---

of fraud or mistake, such particularity is not required.

**3.** Prior to *Kiobel*, the Supreme Court had referenced the issue of corporate liability under the ATS only in dicta in a footnote, without resolving the issue. *See Sosa v. Alvarez–Machain*, 542 U.S. 692, 732 n.20, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (questioning "whether international law extends the scope

of liability" to a defendant that "is a private actor such as a corporation or individual").

**4.** Neither the parties nor this Court have identified an Eighth Circuit decision that has discussed or cited the ATS. Although the Supreme Court affirmed *Kiobel* on alternative grounds, the Second Circuit continues to apply its rule that corporate defendants are *not* subject to ATS liability, *see, e.g., Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 219–

However, the majority of circuit courts of appeals that have addressed this issue have either concluded or assumed that corporations can be liable under the ATS. *Flomo v. Firestone Nat'l Rubber Co.*, 643 F.3d 1013, 1017 (7th Cir. 2011) (collecting cases and describing the Second Circuit's *Kiobel* decision as both an "outlier" and "incorrect"). For example, the Seventh Circuit recognized that, although "corporations have rarely been prosecuted criminally or civilly for violating customary international law," corporate defendants can and have been held liable for violations of international law. *Id.* at 1018. As the Seventh Circuit explained:

> The Alien Tort Statute, moreover, is civil, and corporate tort liability is common around the world. If a corporation complicit in Nazi war crimes could be punished criminally for violating customary international law, as we believe it could be, then *a fortiori* if the board of directors of a corporation directs the corporation's managers to commit war crimes, engage in piracy, abuse ambassadors, or use slave labor, the corporation can be civilly liable. The board members would be liable as well, but they might not have the resources to compensate the victims of the corporation's violation of international customary law, let alone pay punitive damages as well.

*Id.* at 1019 (citations omitted). The Seventh Circuit's reasoning in *Flomo*, which is consistent with the majority view, is persuasive.

Defendants argue that ATS claims against individual private actors should rarely, if ever, be permitted. Although the Eighth Circuit has not addressed this issue, several circuit courts of appeals have done so. Those courts have concluded, assumed, or otherwise suggested that private *individuals* can be liable under the ATS. *See, e.g., Licci*, 834 F.3d at 219; *Flomo*, 643 F.3d at 1019; *Romero v. Drummond Co.*, 552 F.3d 1303, 1316 (11th Cir. 2008). In *Kadic v. Karadzic*, the Second Circuit held that "certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals." 70 F.3d 232, 239 (2d Cir. 1995). In doing so, the Second Circuit reasoned that the Restatement (Third) of the Foreign Relations Law of the United States recognizes slavery, among other things, as an "offense[ ] of universal concern ... capable of being committed by non-state actors." *Id.* at 240 (internal quotation marks omitted). Here, Defendants have not identified any legal authority, either binding or persuasive, that warrants a different conclusion.

Dismissal of Count II on the basis that the ATS does not apply to private actors is not warranted.

## C. Plaintiffs' Forced–Labor Allegations

Defendants also argue that Plaintiffs' amended complaint fails to state a claim under the ATS because the ATS requires a violation of the "law of nations," and alleged forced labor is not a violation of international law. And even if forced labor were cognizable under the ATS as a violation of the law of nations, Defendants contend, the facts alleged in the amended complaint fail to state such a claim here.

20 (2d Cir. 2016), while acknowledging that it is an outlier with respect to this issue, *see In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 157 (2d Cir. 2015) (recognizing that the Supreme Court's affirmance of *Kiobel* on alternative grounds, together with the contrary conclusions of other circuit courts, "indicates that something may be wrong" with the Second Circuit's *Kiobel* jurisprudence). Thus, the persuasive value of the Second Circuit's precedent on this issue is limited.

The Court addresses each argument in turn.

### 1. Cognizability of Forced–Labor Claims Under the ATS

Although the First Congress enacted the ATS in 1789, the ATS was rarely invoked before 1980. *See John Roe I v. Bridgestone Corp.*, 492 F.Supp.2d 988, 1008 (S.D. Ind. 2007) (detailing the history of the ATS). The ATS "grants jurisdiction over two types of claims: those for violations of a treaty of the United States, and those for violations of the law of nations." 14A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3661.2 (4th ed., Apr. 2017 Update); *accord* 28 U.S.C. § 1350. In practice, lawsuits vindicating treaty rights rarely are brought. *See* 14A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3661.2 (4th ed., Apr. 2017 Update). But the Supreme Court's decision in *Sosa* has fostered "a lively discussion amongst scholars and jurists surrounding the determination of whether a norm is recognized in the international community widely and specifically enough" to create jurisdiction under the ATS for an alleged violation of the law of nations. *Id.*

In *Sosa*, the Supreme Court held that, because "the ATS is a jurisdictional statute," it "creat[es] no new causes of action." 542 U.S. at 724, 124 S.Ct. 2739. The *Sosa* Court unanimously recognized that Congress enacted the ATS to confer federal jurisdiction over claims by aliens for "the modest number of international law violations with a potential for personal liability at the time." *Id.* The unanimous portion of the *Sosa* decision recognized that the First Congress had contemplated only three such wrongs: violations of safe conducts, violations of the rights of ambassadors, and piracy. *Id.* at 724, 124 S.Ct. 2739.

The *Sosa* Court was divided about whether federal courts may recognize ad-ditional torts, however. The concurring justices concluded that the scope of the ATS could not be expanded beyond the three categories contemplated by the enacting Congress. *Id.* at 744, 124 S.Ct. 2739. But the majority concluded that there is not a categorical bar to federal courts recognizing other claims that are actionable under the ATS as violations of the "law of nations." *Id.* at 724–25, 124 S.Ct. 2739. Instead, the majority reasoned, federal courts should exercise discretion and "great caution" when considering whether other torts are actionable under the ATS, "subject to vigilant doorkeeping." *Id.* at 728–29, 124 S.Ct. 2739. The majority explained:

> Whatever the ultimate criteria for accepting a cause of action subject to jurisdiction under § 1350, we are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted.... And the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts.

*Id.* at 732–33 (citations omitted) (footnotes omitted). As such, a plaintiff must demonstrate an alleged violation of an international norm that is "specific, universal, and obligatory." *Id.* at 732, 124 S.Ct. 2739 (internal quotation marks omitted). When recognizing such norms, courts must determine "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Id.* at 733 n.20, 124 S.Ct. 2739.

The *Sosa* Court then applied this analytical framework to the circumstances of that case. Respondent Alvarez–Machain, a Mexican national, was abducted in Mexico and transported to the United States to face criminal prosecution for the torture and murder in Mexico of a United States government agent. *Id.* at 697–98, 124 S.Ct. 2739. After he was acquitted in the criminal case, Alvarez–Machain sued his abductors for monetary damages in federal court under the ATS on the theory that his arrest and detention were torts in violation of international law. *Id.* at 698, 124 S.Ct. 2739. The Supreme Court disagreed, concluding that there was neither a treaty of the United States nor an established international norm prohibiting "arbitrary detention" that was sufficiently specific, universal, and obligatory. *Id.* at 733–38, 124 S.Ct. 2739. Of particular concern to the Court was the breadth of Alvarez–Machain's legal theory, under which an unauthorized arrest or detention anywhere in the world—including, for instance, a "reckless policeman who botches his warrant"— would violate international law and support federal jurisdiction under the ATS. *Id.* at 736–37, 124 S.Ct. 2739. The Court suggested that "arbitrary detention" might violate an international norm in some circumstances, but that "[a]ny credible invocation of a principle against arbitrary detention that the civilized world accepts as binding customary international law requires a factual basis beyond relatively brief detention in excess of positive authority." *Id.* at 737, 124 S.Ct. 2739. Thus, whether a claim is cognizable under the ATS depends in part on the specific facts alleged in support of the claim.

■ Here, Plaintiffs' amended complaint provides little express insight into the basis for the allegation that Defendants' conduct violates a "specific, universal, and obligatory" international norm prohibiting forced labor. The amended complaint cites the United Nations International Labour Organization's (ILO) definition of forced labor as "all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily," including forced labor "for the benefit of private individuals, companies or associations." ILO Forced Labour Convention No. 29 (ILO Convention 29), art. 2 & 4, June 28, 1930, 39 U.N.T.S. 55. But the United States has not ratified ILO Convention 29. *See Bridgestone*, 492 F.Supp.2d at 1012, 1015. Although Plaintiffs have cited case law that references ILO Convention 29 in similar contexts, even those decisions recognize that ILO Convention 29 has not been ratified by the United States and has limited value when determining whether a cause of action exists under the ATS. *See, e.g., Velez v. Sanchez*, 693 F.3d 308, 320 n.9 (2d Cir. 2012); *Bridgestone*, 492 F.Supp.2d at 1012, 1015. Moreover, *Sosa* rejected the argument that an international agreement lacking legally binding force could form the basis for a cause of action under the ATS. 542 U.S. at 734–35, 124 S.Ct. 2739 (concluding that Universal Declaration of Human Rights and International Covenant on Civil and Political Rights did not "create obligations enforceable in the federal courts"). In sum, ILO Convention 29 is insufficient to establish a "specific, universal, and obligatory" treaty-based international norm that satisfies the *Sosa* framework.

■ Absent a specific treaty, a cause of action under the ATS also may be based on a violation of the law of nations, in other words, "norms of customary international law." 14A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3661.2 (4th ed., Apr. 2017 Update). Federal case law has "fairly well established that the [ATS] provides jurisdiction over cases involving various forms

of official or state sponsored torture, genocide, war crimes, crimes against humanity, *as well as forced labor, servitude and slavery.*" *Id.* (emphasis added) (collecting cases). In responding to Defendants' motion to dismiss, Plaintiffs marshal this federal case law to support their argument that forced labor is a violation of customary international norms.

Although the Eighth Circuit has not addressed the ATS, courts in other jurisdictions have done so both before and after *Sosa*, specifically in the context of alleged forced labor. These courts have either concluded or assumed that some forms of forced labor can violate customary international norms. *See, e.g., Velez*, 693 F.3d at 319–23 (assuming, without deciding, that international law prohibits slavery and related practices of forced labor and involuntary servitude and collecting cases in support of that proposition); *Bridgestone*, 492 F.Supp.2d at 1010–19 (same); *see also Adhikari v. Daoud & Partners*, 697 F.Supp.2d 674, 687 (S.D. Tex. 2009) (concluding that, for jurisdictional purposes, plaintiffs adequately alleged that universal international norms prohibit international trafficking of individuals, through deceit and coercion, to work against their will); *Licea v. Curacao Drydock Co.*, 584 F.Supp.2d 1355, 1358 (S.D. Fla. 2008) (concluding that "the forced labor and international human trafficking alleged and proved in this matter clearly constitute violations of universal and obligatory norms of international law"); *Doe I v. Reddy*, No. 02-05570, 2003 WL 23893010, at *9 (N.D. Cal. Aug. 4, 2003) (finding that plaintiffs stated claims for forced labor, debt bondage, and trafficking under the ATS based on allegations of "coercive conduct through threats, physical beatings, sexual battery, fraud and unlawful substandard working conditions); *In re World War II Era Japanese Forced Labor Litig.*, 164 F.Supp.2d 1160, 1179 (N.D. Cal. 2001)

(recognizing that forced labor violates the law of nations).

For example, the Second Circuit recognized in *Velez* that "the prohibition of slavery is one of the most well-established customary rules in international law" and that the "international prohibition against slavery has evolved to encompass more modern variants such as forced labor and servitude." 693 F.3d at 319 (internal quotation marks omitted). The Second Circuit referenced several sources to support this conclusion:

An early marker of this development was the Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery ("Supplementary Convention"), which denounced forms of coerced servitude mirroring slavery, including any "practice whereby a child or young person under the age of 18 years[ ] is delivered by either or both of his natural parents or by his guardian to another person, whether for reward or not, with a view to the exploitation of the child or young person or of his labour." Supplementary Convention art. 1(d), Sept. 7, 1956, 226 U.N.T.S. 3 (committed to by 123 countries, including the United States). Following the extensive use of forced labor during World War II, the London Charter, which authorized the punishment of war criminals and crystallized preexisting customary international law concerning fundamental human rights, provided for individual liability for the crimes of deportation for slave labor and enslavement of the civilian population. Charter of the International Military Tribunal—Annex to the Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis art. 6, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279.

*Id.* at 319–20 (internal quotation marks and citations omitted). The *Velez* court also cited ILO Convention 29. *Id.* at 320 & n.9. Assuming without deciding that these sources "demonstrate a firmly established consensus in international law prohibiting slavery and the related practices of forced labor and involuntary servitude," the *Velez* court concluded that the plaintiff had not demonstrated a violation of this norm to survive summary judgment. *Id.* at 320–22; *see also Bridgestone*, 492 F.Supp.2d at 1010–19 (conducting similar analysis and reaching same conclusion).

The foregoing cases are instructive and persuasive. The United States is a signatory of the Slavery Convention of 1926, which not only includes a definition of slavery focused on ownership, but also addresses forced labor and requires signatories to "take all necessary measures to prevent compulsory or forced labour from developing into conditions analogous to slavery." Slavery Convention, Art. 5, 60 L.N.T.S. 253 (1926). The United States also is a party to the Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery (Supplementary Slavery Convention), which expands the Slavery Convention's scope and expressly refers to ILO Convention 29 and "subsequent action by the International Labour Organisation [sic] in regard to forced or compulsory labour." Supplementary Convention, Preamble, Sept. 7, 1956, 226 U.N.T.S. 3; *accord Velez*, 693 F.3d at 319–20 (recognizing that the Supplementary Slavery Convention "denounced forms of coerced servitude mirroring slavery"). Although they do not define forced labor, these agreements refer to forced labor, and courts have relied on these agreements when reasoning that forced labor can violate customary international norms. *See, e.g., Velez*, 693 F.3d at 319–23; *Bridgestone*, 492 F.Supp.2d at 1010–19.

As the Supreme Court held in *Sosa*, however, to be actionable under the ATS, violations of international norms must be "specific." 542 U.S. at 732, 124 S.Ct. 2739 (internal quotation marks omitted). Neither the Slavery Convention nor the Supplementary Slavery Convention defines "forced labor" or "compulsory labor." But as Plaintiffs argue, ILO Convention 29 defines forced labor. And ILO Convention 29 is instructive when viewed in conjunction with the foregoing sources, including the Slavery Convention and the Supplementary Slavery Convention. Courts have applied ILO Convention 29 to conclude that a forced-labor claim under the ATS comprises three elements: "(1) work or service performed; (2) under the menace of any penalty; (3) for which the person has not offered himself or herself voluntarily." *Velez*, 693 F.3d at 320 (internal quotation marks omitted); *accord Bridgestone*, 492 F.Supp.2d at 1012. Notably, excluded from this definition of forced labor are several categories of compulsory service—namely, military service, normal civic obligations, work compelled as part of a criminal sentence under the supervision of public authorities, and services exacted in emergency situations such as war or natural calamity. *See* ILO Convention 29, art. 2.

Based on the foregoing analysis and the persuasive authority addressed above, the Court concludes that international norms prohibit forced labor as that term is defined by ILO Convention 29.

### 2. Plaintiffs' Forced–Labor Factual Allegations

 Defendants argue that, even if such a claim is cognizable, Plaintiffs have not alleged facts sufficient to state a claim for a violation of the international norm against forced labor. Defendants do not dispute that the amended complaint ade-

quately alleges that Plaintiffs performed work or service for Defendants. Nor do Defendants contend that Plaintiffs' work involved any of the categories of compulsory service excluded from the definition of forced labor in ILO Convention 29. Rather, Defendants argue that Plaintiffs' factual allegations fail to establish that their work was involuntary or performed under the menace of any penalty.

When "applying the ATS to forced labor claims, courts in the United States have tended to require more than evidence of terrible working conditions and inadequate wages to state a cognizable violation of customary international law." *Velez*, 693 F.3d at 321. The plaintiff in *Velez* alleged that she was trafficked from Ecuador and forced to provide domestic help in her stepsister's home. *Id.* at 314–15. In contrast to cognizable forced-labor claims under the ATS, the Second Circuit observed in *Velez* that the plaintiff presented no evidence of physical abuse or confinement, conceded that she did not fear violence, and left the household in which she was working shortly after the alleged conduct occurred. *Id.* at 321–22. In light of these deficiencies, the Second Circuit concluded that the record evidence did "not amount to a menace of penalty sufficient to consider her continued labor as forced." *Id.*

Many of the cases in which ATS forced-labor claims have survived—and on which Plaintiffs rely here—have involved egregious violations of human dignity. *E.g.*, *Deutch v. Turner Corp.*, 324 F.3d 692, 705 (9th Cir. 2003) (plaintiffs subjected to starvation, beatings, physical and mental torture, transport by ship in unventilated cargo holds, forced marches through the tropical sun without water, and threats of execution or death from disease); *Adhikari*, 697 F.Supp.2d at 687 (involving international trafficking of individuals, through deceit and coercion, to work against their will); *Licea*, 584 F.Supp.2d at 1361–63 (in-

volving plaintiffs held in captivity who suffered severe injuries as a result of their work, were denied medical treatment, and risked imprisonment, death, and the persecution of their families by the Cuban government if they escaped). By contrast, the cases in which courts have dismissed forced labor claims under the ATS for insufficient factual allegations involved poor working conditions but did not include physical violence, force, confinement or constraints. *See, e.g., Velez*, 693 F.3d at 321–23 (evidence of poor working conditions, disparaging remarks, and social isolation); *Bridgestone*, 492 F.Supp.2d at 1015–19 (allegations of poor working conditions, low wages, and threats to terminate employment).

The allegations here are not as egregious as some of the forced labor allegations in the cases cited above. Plaintiffs do not allege that they were trafficked to a foreign country, held captive for extended periods of time, or threatened with death, torture or starvation. But Plaintiffs' allegations are more egregious than those in *Velez* and *Bridgestone*. In addition to poor working conditions and inadequate compensation, Plaintiffs allege that they were subjected to physical violence, periodic physical restraint and confinement, and threats including but not limited to threats of deportation. Plaintiffs also allege that, by means of this conduct, Defendants extracted uncompensated labor from Plaintiffs and, through threats and intimidation, prevented Plaintiffs from leaving their employment for many years. When examined in light of the spectrum of conduct in the cases addressed above—ranging from poor working conditions to servitude—the allegations here fall squarely in the middle.

 As the Second Circuit recognized in *Velez*, the "menace of any penalty ... can include credible threats of financial penalties, denunciation to immigration au-

thorities, and deportation," and "forced" labor can occur in a "climate of fear" without any express threat of a penalty. 693 F.3d at 321; *accord Bridgestone*, 492 F.Supp.2d at 1012–14. Here, the amended complaint's allegations of physical violence, confinement, and threats of deportation distinguish this case from *Velez* and *Bridgestone*. As such, the amended complaint is sufficient to allege a violation of the international norm prohibiting forced labor. Whether Plaintiffs ultimately prove that the alleged conduct is sufficiently egregious to violate this international norm is not the issue presented here. A plaintiff need not *prove* its case at the pleadings stage. Allowing this litigation to proceed will provide the parties the opportunity to develop the record on this issue. At this early juncture in the litigation, Plaintiffs' allegations are sufficient to allege a violation of the ATS and survive Defendants' Rule 12(b)(6) motion.

For these reasons, Defendants' motion to dismiss Count II of the amended complaint is denied.

### III. Plaintiffs' TVPRA Claim (Count III)

■ Defendants also move to dismiss Plaintiffs' TVPRA claim, Count III of the amended complaint, for failure to state a claim. Fed. R. Civ. P. 12(b)(6). Defendants assert that dismissal is warranted because Plaintiffs fail to allege specific facts in addressing the elements of a TVPRA claim. Instead, Defendants argue, Plaintiffs' allegations are "conclusory," "implausible," and merely a "formulaic recitation of the elements" of the cause of action.

As relevant here, the TVPRA imposes criminal liability on:

(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). A civil remedy against the perpetrator or a beneficiary of the unlawfully obtained labor or services is available to an individual who is a victim of that conduct. 18 U.S.C. § 1595(a).

■ The purpose of the TVPRA "is to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominately women and children, to ensure just and effective punishment of traffickers." *Vaughan v. Aegis Commc'ns Grp., LLC*, 49 F.Supp.3d 613, 622 (W.D. Mo. 2014) (internal quotation marks omitted). When enacting the TVPRA, "Congress intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion ... and the means used by modern-day traffickers are increasingly subtle." *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (internal quotation marks omitted). Threatening employees with immigration consequences in order to prevent them from leaving employment constitutes a "threatened abuse of the legal process" under Section (a)(3) of the TVPRA. *Ramos–Madrigal v. Mendiola Forestry Serv., LLC*, 799 F.Supp.2d 958, 960 (W.D. Ark. 2011); *accord United States v. Kozminski*, 487 U.S. 931, 948, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988)

(observing that "threatening ... an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude").

Here, eleven Plaintiffs specifically allege that one or more of the corporate defendants for which they worked locked them in parts of Defendants' grocery stores, including freezers, on multiple occasions. Three Plaintiffs—including the only Plaintiff who did not specifically allege any form of physical confinement—specifically allege that they were threatened with deportation. These allegations state a claim for relief under the TVPRA.

Defendants assert that these allegations are "conclusory," "implausible," and nothing more than a "formulaic recitation of the elements" of the cause of action. But Plaintiffs' allegations are neither "conclusory" nor "implausible" merely because they do not plead every detail. The factual allegations in a complaint are sufficiently detailed so long as they "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570, 127 S.Ct. 1955. Here, Plaintiffs' allegations satisfy that standard. The amended complaint does more than recite the elements of a TVPRA claim; it describes numerous specific instances in which Plaintiffs allegedly were confined or threatened by one or more of the Defendants.

Accordingly, Defendants' motion to dismiss Count III of the amended complaint is denied.

## IV. Plaintiffs' RICO Claim (Count IV)

■■■■ Defendants also seek dismissal of Plaintiffs' RICO claim, Count IV of the amended complaint, for failure to state a claim. Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009) (quoting 18 U.S.C. § 1962(c)). The victim of a racketeering scheme may bring a civil action against a defendant alleged to have violated RICO. *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015) (citing 18 U.S.C. § 1964(c)). To state a claim under RICO, a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Nitro Distrib.*, 565 F.3d at 428 (quoting *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).

Here, Defendants assert that Plaintiffs fail to allege (1) an "enterprise" that is separate and distinct from the persons sought to be held liable (*i.e.*, Defendants); (2) that the purported enterprise affected interstate or foreign commerce; and (3) the existence of a predicate offense to satisfy the "racketeering" element of RICO. The Court addresses each argument in turn.

### A. Distinct Enterprise

■■■■ Because RICO prohibits a "person" associated with an "enterprise" from participating in the affairs of the enterprise through a pattern of racketeering activity, "the person named as the defendant cannot also be the entity identified as the enterprise." *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995 (8th Cir. 1989) (citing *Bennett v. Berg*, 685 F.2d 1053, 1061–62 (8th Cir. 1982)). Under RICO, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and *any union or group of individuals associated in fact although not a legal entity*." 18 U.S.C. § 1961(4) (emphasis added). As such, an

enterprise may be an association in fact composed of multiple entities. *Atlas Pile Driving*, 886 F.2d at 995. When a plaintiff alleges that the defendants collectively are members of an association-in-fact enterprise, the enterprise and the defendants are not impermissibly identical. *Id.* For these reasons, so long as Plaintiffs have adequately alleged an association-in-fact enterprise, the fact that Defendants are members of that enterprise will not warrant dismissal because a "collective entity is something more than the members of which it is comprised." *Id.*

 "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). Although an association-in-fact need not have any particular indicia of organization such as a hierarchical structure, a chain of command, a name, regular meetings, dues, or established rules and regulations, it must have a discrete existence and structure uniting its members in a cognizable group. *Id.* at 948–49, 129 S.Ct. 2237.

 Here, the amended complaint alleges that "Defendants' [sic] are an enterprise engaged in a pattern of conduct of racketeering activity including forced labor ... and witness tampering." The amended complaint further alleges that the two individual defendants are brothers who, together with other family members and agents, own and operate the five corporate defendants, all of which are Asian-food distribution companies that operate grocery stores in the Minneapolis–St. Paul metropolitan area. Plaintiffs allege that employees frequently are moved between Defendants' grocery stores and that the individual defendants sometimes direct employees to work at their personal residences. And Defendants' alleged conduct spans at least several years.

The amended complaint sufficiently alleges an "enterprise-in-fact" with the three structural features required by the Supreme Court in *Boyle*—namely, "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946, 129 S.Ct. 2237.

Accordingly, dismissal of Count IV on this basis is not warranted.

### B. Affecting Commerce

 Defendants also argue that Plaintiffs fail to allege that the purported enterprise affected interstate or foreign commerce. To be liable under RICO, an enterprise must be "engaged in, or the activities of which [must] affect, interstate or foreign commerce." 18 U.S.C. § 1962. A corporation is "engaged in commerce when it is itself directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce." *United States v. Robertson*, 514 U.S. 669, 672, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995) (internal quotation marks omitted); *accord Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1289 (7th Cir. 1983) (explaining that the criteria for finding a nexus with interstate commerce is "minimal" under RICO, and that dismissal at the pleading stage on this basis would be "premature").

 The amended complaint does not expressly reference interstate or foreign commerce. Nonetheless, the amended complaint alleges that Defendants operate Asian-food grocery stores in the Minneapolis–St. Paul metropolitan area. Plaintiffs also allege that, on several occasions, Defendants directed Plaintiffs to wire money to Cambodia. When the factual allegations are viewed in the light most favorable to

Plaintiffs and all reasonable inferences are drawn in Plaintiffs' favor, the amended complaint adequately pleads facts that, if true, would support a nexus with interstate or foreign commerce. To be sure, the purpose of the alleged money transfers to Cambodia is unclear from the amended complaint. But even when those allegations are disregarded, it is highly unlikely that Defendants' Asian-food grocery stores acquire and sell products sourced solely within the state of Minnesota. Although it may have been preferable for Plaintiffs to expressly allege that Defendants' activities "affected interstate commerce," their failure to use that precise language does not warrant dismissal of Count IV.

### C. Racketeering

 Defendants argue that Plaintiffs have not alleged a predicate offense to satisfy the racketeering element of RICO. Racketeering activity is statutorily defined by reference to an exclusive list of criminal statutes. *See* 18 U.S.C. § 1961(1). A " 'pattern of racketeering activity' requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). And a pattern is established only if the predicate acts are related to, "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *accord Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402, 406 (8th Cir. 1999).

 A violation of the TVPRA is a predicate act under RICO. *See* 18 U.S.C. § 1961(1). Defendants' racketeering argument relies in part on this Court agreeing with Defendants' contention that Plaintiffs have failed to allege a TVPRA violation. But as addressed above in Part III, Plaintiffs have adequately alleged facts that, if true, could establish a violation of the

TVPRA. Indeed, the amended complaint alleges facts that, if proven, establish multiple violations of the TVPRA against multiple people on numerous occasions. Dismissal of Count IV is not warranted on this basis.[5]

For the foregoing reasons, Defendants' motion to dismiss Count IV of the amended complaint is denied.

### ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' motion to dismiss, (Dkt. 52), is **DENIED**.

---

5. Because Plaintiffs' TVPRA allegations sufficiently support the racketeering element of their RICO claim, the Court need not address Plaintiffs' alternative allegation that Defendants' "witness tampering" also constitutes a predicate act of racketeering activity.